## LOWE v. COLUMBIAN NAT. LIFE INS. CO.

### No. 6465.

District Court, W. D. Pennsylvania.

Jan. 28, 1932.

John D. Meyer, of Pittsburgh, Pa., for plaintiff.

Smith, Buchanan, Scott & Gordon and William H. Eckert, all of Pittsburgh, Pa., for defendant.

GIBSON, District Judge.

#### Findings of Fact.

1. On August 15, 1930, John E. Lowe, husband of the plaintiff, died in his garage. His death resulted from gases emanating from his automobile.

2. At the time of his death, and for about five years prior thereto, John E. Lowe

was president of the Lowe Motor Company, a corporation engaged in the sale of automobiles. This company had five stockholders, Lowe, Elias Ritts, W. C. Cheeseman, Benjamin R. Williams, and Charles C. Watson, each of whom held one-fifth of the capital stock of the company. The total capital stock was $50,000 in amount.

3. At the time of his death, John E. Lowe was personally liable as a guarantor of notes made or indorsed by the Lowe Motor Company and held by several banks, in the amount of $81,809.54. The other four stockholders were joint guarantors of said notes with Lowe.

4. Prior to the time of his death, John E. Lowe had withdrawn from the funds of the Lowe Motor Company, by checks drawn to his order and cashed or deposited to his personal bank account, amounts aggregating over $50,000. These amounts were charged to the account of Lowe in the books of account of the company, but were later credited to him as having been expended for "Commissions," "Adjustments," "Incidentals," "Expenses," and the like, but for such credits no supporting memoranda or data was found among the records of the company. A direct indebtedness of Lowe to the company of $5,309.37 was shown by the company's books of account.

5. At the time of his death, an insurance policy upon the life of John E. Lowe, in amount of $25,000, was in force; the Lowe Motor Company being the beneficiary. The amount of this policy has been paid to the company.

6. At the death of John E. Lowe, he was the insured in a certain accident insurance policy issued by the defendant company. The insurer, by the terms of this policy, undertook to pay to the beneficiary, Bertha A. Lowe, the plaintiff herein, the sum of $15,000 upon the accidental death of the insured. The insurer was not to be liable in case death resulted from suicide.

7. On August 26, 1930, the following paper was signed by Bertha A. Lowe, the plaintiff; said paper being signed by Elias Ritts and W. C. Cheeseman as witnesses:

"Glenshaw, Pa. Aug. 26, 1930.
"In consideration of the other stockholders of the Lowe Motor Co. providing at once necessary funds to care for maturing obligations of this corporation, I hereby agree to apply so far as necessary, funds from the accident insurance policy on the life of Jno E Lowe and payable to me, up to and not exceeding $12,000 for which Jno E Lowe would

have been personally responsible, and in the same proportion if the above mentioned accident insurance policy of $15000. should not be paid in full.
"[Signed]   Mrs. Bertha Lowe   [Seal]
"Witness:  W. C. Cheeseman
"Witness:   Elias Ritts."

8. On the date last mentioned Bertha A. Lowe signed the following paper, intended to be a copy of the paper set out in the preceding paragraph, which was also signed by Elias Ritts and W. C. Cheeseman as witnesses:

"Glenshaw, Pa. Aug. 26, 1930.
"In consideration of the stockholders of the Lowe Motor Co. providing at once necessary funds to care for maturing obligations of this corporation, I hereby agree to apply so far as necessary, funds from the accident insurance policy on the life of J. E. Lowe payable to me, up to and not exceeding $12000 for obligations of the Company for which Jno E Lowe would have been personally responsible, and in the same proportion if the policy of $15000 is not paid in full.
"[Signed]   Mrs. Bertha Lowe   [Seal]
"Witness:  W. C. Cheeseman
"Witness:   Elias Ritts."

9. The papers set forth in the seventh and eighth findings were each written by W. C. Cheeseman, and were signed by the plaintiff upon request of W. C. Cheeseman and Elias Ritts.

10. Said Elias Ritts and W. C. Cheeseman, at the time said plaintiff signed said papers, did not make willfully false and fraudulent statements of fact to said plaintiff for the purpose of thereby inducing her to execute the papers. However, out of consideration for the plaintiff, they did not fully inform her of the desperate financial condition of the Lowe Motor Company at the time, but told her, in substance, that the company was not in as good condition as had been supposed; that it had a number of obligations falling due in the immediate future; that the stockholders were individually liable upon these obligations; and that it would be necessary for the stockholders to put more money into the company to meet them, if the company were to be kept in operation. She was not informed of any alleged wrongful withdrawal of the funds of the company for his personal use by John E. Lowe.

11. Several days after the execution of the papers described in the seventh and eighth findings, the plaintiff, Bertha A. Lowe, at the Butler County National Bank & Trust Com-

pany, was given as full information as to the condition of the Lowe Motor Company and the obligations of John E. Lowe to it as was known at the time by the stockholders. At that time she made no statement indicating an intent to repudiate the agreement.

12. Bertha A. Lowe, in executing the agreement of August 26, 1930, had no intention to assign her claim, or any part of it, upon the defendant under the accident insurance contract mentioned in the sixth finding of fact, to the living stockholders of the Lowe Motor Company or to the company; nor did she intend thereby to part to any extent with her own control of her said claim under said policy of insurance. She never notified the defendant company of her agreement; nor was the defendant ever notified of it by the Lowe Motor Company or its stockholders, nor did the defendant agree to honor it as a valid assignment of, or lien upon, the accident policy fund, prior to the institution of the instant action.

13. After the paper of August 26, 1930, was signed by Bertha A. Lowe, certain of the obligations of the Lowe Motor Company were paid by, or met, by moneys or notes furnished by the stockholders. Just how much of the maturing indebtedness was paid by the stockholders, or by any of them, from their own funds, does not appear in the testimony. All of the company's note obligations, for which John E. Lowe and the other stockholders were also liable, had not been paid prior to the institution of the present action. On May 6, 1931, the original obligations of the motor company to the Bloomfield Trust Company, amounting to $37,550 at the death of John E. Lowe, had been reduced to the sum of $12,500, and the obligations to the Bank of Pittsburgh, $23,500 at the death of Lowe, had been reduced to $16,600. Upon that date the indebtedness of the motor company, guaranteed by the five stockholders, still continued to the extent indicated.

14. The sum of $24,600, received by the Lowe Motor Company upon insurance policy upon the life of John E. Lowe (fifth finding), was used in the payment of obligations of the company; also the proceeds of the sale of the assets, etc., of the company, on September —, 1930, amounting to $24,184.31, were used for the same purpose; also $6,000 received upon accounts.

15. On September 23, 1930, the Lowe Motor Company, and Elias Ritts, W. C. Cheeseman, Charles C. Watson, and Benjamin R. Williams, the surviving stockholders, assigned the paper set forth in the seventh finding of fact to the Butler County National Bank & Trust Company, and on March 27, 1931, the bank, the motor company, and the stockholders joined in a transfer of it to the defendant (see Exhibit C, Supplement to Affidavit of Defense). No notice of either of these assignments to Bertha A. Lowe is shown by record prior to the filing of the supplemental affidavit of defense.

## Conclusions of Law.

I. The paper dated August 26, 1930, signed by Bertha A. Lowe and witnessed by W. C. Cheeseman and Elias Ritts, was not executed by Bertha A. Lowe by reason of willfully false statements made to her or fraud upon her by W. C. Cheeseman and Elias Ritts.

II. The said paper dated August 26, 1930, is not a valid equitable assignment of any part of the claim of Bertha A. Lowe against the Columbian National Life Insurance Company, the defendant, under the accident insurance policy set out in the statement of claim.

III. The said paper of August 26, 1930, not being a valid equitable assignment of any part of the claim of plaintiff against the defendant, an assignment of said paper to the defendant is not a proper or legal basis for its claim of set-off against the plaintiff, and proof thereof is inadmissible, upon trial of the instant action, to a jury.

## Discussion.

In its supplemental affidavit of defense to plaintiff's claim, based upon a policy of life insurance, defendant has, in effect, claimed a set-off of $10,000. The basis of this claim is the assignment to it of the paper set forth in the seventh finding of fact, supra. The plaintiff, answering the supplemental affidavit, has asserted that her signature to the paper was obtained by means of false and fraudulent representations, that the paper is not a legal or equitable assignment of any part of her claim, and that it is void because of lack of consideration, and because of uncertainty as to its terms and parties. The answer of the plaintiff having introduced an equitable issue, defendant prayed the court to try that issue as a chancellor prior to the trial of the issue of fact to the jury. The court granted this petition over the opposition of plaintiff, and the equitable issue is now the subject of our consideration.

The paper in dispute, drawn by a layman, is certainly lacking in desirable precision and clarity. A consideration of the respective sit-

uations of the plaintiff and the stockholders will remove some of the ambiguities.

John E. Lowe had been the manager of the motor company. At the time of his death, both he and the motor company were insolvent, but this was not then known to his fellow stockholders or to his wife, the plaintiff. After his death, it appeared that certain checks given by the company were unpaid by reason of no funds in the bank, and the stockholders thereupon proceeded to investigate the affairs of the company. It soon developed that the company had notes in several banks which aggregated over $81,000, upon which the stockholders were jointly and severally liable. It also appeared that John E. Lowe had used a very considerable amount of the company's money for his own purposes. On the day upon which plaintiff signed the agreement under discussion, Messrs. Ritts and Cheeseman had considerable knowledge of the serious situation of the company. But, while this appears from the testimony, it does not appear that they were fully informed in respect to it. In particular, the actual value of the company's assets was not entirely known by them; nor does it appear that they were aware of the insolvency of John E. Lowe. Had they been fully informed of the actual situation, the suppression of their knowledge from Mrs. Lowe would have stamped their acquirement of the agreement with the imprint of fraud. No legal reason or consideration whatsoever existed for Mrs. Lowe's promise, unless it is found in her desire to maintain the value of the stock which she expected to receive, or thought she had received, as heir to her husband. The stock worthless, nothing other than a possible sentimental reason existed for an agreement which was then a mere promise of a gift. As stated, however, the testimony is not such as to satisfy us that Messrs. Ritts and Cheeseman had such a knowledge, or such an appreciation, of the actual facts as would make their declarations to Mrs. Lowe willfully false and fraudulent. They did, with a desire not to wound, suppress any mention of improper actions by, or indebtedness to the company of, plaintiff's husband, and discussed only the notes about to become due and the need of taking care of them at once. This fact must be kept in mind in determining the scope of Mrs. Lowe's agreement of August 26, 1930. The plaintiff was not responsible for her husband's debts, and her agreement is not to be expanded to relate to them. The plaintiff, with her then imperfect knowledge of the affairs of the company and of her husband, considered herself a stockholder, and agreed to contribute from her insurance fund, with the other stockholders, an amount sufficient to pay the notes of the company maturing in the immediate future. The extent of her contribution was to be limited to four-fifths of the amount which she should recover upon her accident policy, if such an amount should be necessary to pay the "maturing obligations" of the company. Why the four-fifths proportion was fixed upon is rather inadequately explained by W. C. Cheeseman as follows: "We arrived at the amount, there were five in the company, and that would be a matter of $3000 apiece, so that we said it would be but fair, we felt, to ask her to protect us up to the $12,000, if that amount were needed."

The logic of this division of the insurance fund, by which it was to be divided into five parts because there were five stockholders in the company, is certainly not obvious. It may have no great significance, although tending to show some confusion in the minds of those engaged in constructing the contract.

An examination of the two forms of the agreement, varying as they do in some details, in conjunction with the condition of the parties and the circumstances, fails to remove all doubt as to just what Mrs. Lowe agreed to do, and what the surviving stockholders were to do as a prerequisite to her payment. It seems plain that the "maturing obligations of the corporation" were not all the note obligations, because such obligations amounted to more than $81,000, and John E. Lowe and each of the other stockholders, as a guarantor, was responsible for the entire sum. It was testified by the stockholders that they paid the maturing indebtedness of the company, but nowhere is it stated just what sums were paid by each of them. We know that they did not interpret "maturing obligations" as all the bank obligations, because almost 50 per cent. of such indebtedness was unpaid at a time subsequent to the beginning of this suit. We know, also, that certain sums were collected from debtors of the company, and also that a sum was received from the sale of the company property which, if applied to the payment of the bank obligations, would have reduced the amount chargeable to Mrs. Lowe, if she were to pay one-fifth of the bank obligations, to less than $12,000. In the introduction of testimony upon the trial, and in argument, counsel for the defendant seems to assume that the payment of Mrs. Lowe was to be for all sums for which John E. Lowe might be responsible to the company. This position ignores the purported copy of the agreement given Mrs. Lowe at the time of

execution and the testimony of Elias Ritts and W. C. Cheeseman. Mrs. Lowe's copy of the agreement, admittedly written by Mr. Cheeseman, states that the $12,000, or needed sum, to be paid from the proceeds of the accident policy, was to be "for obligations of the Company for which Jno. E. Lowe would have been personally responsible"; and the testimony of Messrs. Ritts and Cheeseman was to the effect that nothing was mentioned in the discussion with Mrs. Lowe except bank obligations about to fall due. Any misapplication of funds by John E. Lowe was not mentioned. As before stated, the agreement cannot be so enlarged. As we interpret the paper, Mrs. Lowe was agreeing by it to pay from her insurance money a sum which her husband and each of the shareholders would have been required to pay to meet the immediately maturing notes of the company. The amount of that sum does not appear in the agreement or in the testimony.

■■■ As we view the agreement, even as supported by the testimony, it is altogether too vague an instrument to affix a lien upon the accident insurance fund. No particular form is required, it is true, to constitute a valid equitable assignment, but it is necessary that the used words clearly create an irrevocable appropriation of the fund. In other words, the fund is placed under the control of the creditor, and the holder of the fund is in duty bound to honor the assignment in due time. In the present case the writing does not even definitely name the promisee or promisees. It nowhere gives any indication of an intent on the part of the promisor to part with control of the fund, or any part of it, but is a mere promise to pay from that fund. Such a mere promise does not constitute an equitable assignment. Christmas v. Russell, 14 Wall. 69, 20 L. Ed. 762. In the present writing, while the maximum amount of the promise is fixed, no definite sum is named. The promise is to apply funds "so far as necessary." To hold the instant writing a valid assignment, we must also hold that the plaintiff relinquished all power of judgment as to the necessity of the payments made, and transferred all her rights in that respect to the defendant. The latter is called upon to determine the unnamed promisor or promisees, the meaning of the expression "maturing obligations of this corporation," and the extent of the compliance of the stockholders with the condition precedent to the writing becoming effective. We find no such authority in the writing.

■■■ The present alleged assignment of part of the fund has not been marked by the ordinary incidents of a valid equitable assignment. No notice of its execution was ever given the fundholder, defendant, by the plaintiff, nor by the Lowe Motor Company or its stockholders until after this suit had been brought. The ordinary rule requires prompt notice of the assignment to the fundholder and acquiescence to it on his part.

Our attention has been called to American Surety Co. v. Finletter, 274 F. 152 (C. C. A. 3), opinion by Judge Woolley, wherein Walker v. Brown, 165 U. S. 654, 17 S. Ct. 453, 41 L. Ed. 865, and Ingersoll v. Coram, 211 U. S. 335, 29 S. Ct. 92, 53 L. Ed. 208 are followed. The facts in each of these cases differed materially from those of the instant case. In the first case mentioned, a contractor for a building for the city of Philadelphia agreed with his surety that, in event of his default and the surety were thereby made liable upon the bond, all deferred payments by the city to the contractor should be credited to the surety upon any claim upon the latter by reason of its suretyship. The contractor's agreement, in such cases, is made a part of the contract of suretyship, and the acceptance of the bond by the city was also an acquiescence of the appropriation of the deferred payments in case of default by the contractor. The city was not, as the fundholder here, required to act as a judge and jury in settlement of a dispute upon an obscure provision of the agreement, but in reality a party to the provisional appropriation of amounts which were beyond dispute at the time of default. The decisions cited in the opinions, Walker v. Brown and Ingersoll v. Coram, were also in relation to cases wherein distinct appropriations of the funds in question had been made, and they, as well as American Surety Co. v. Finletter, assert an unquestioned principle: That, where a party sufficiently indicates an intention to make some particular fund security for a debt or other obligation, by express executory agreement, he thereby creates an equitable lien upon the property indicated. But the facts in this case do not bring it within the scope of the rule. The plaintiff, a woman then without sufficient funds, was agreeing to pay a part of the amount immediately necessary to keep the motor company in operation when and if she received the proceeds of the insurance policy, provided the living stockholders furnished such necessary funds at once, and provided also that the amount of her payment should not be over $12,000, and that the obligations paid were such as were liabilities of her husband, as well as the motor company. We find no intention expressed in her

agreement of subjecting her claim upon the insurance company, or any part of it, to the control of any person other than herself, or of making that claim security for her performance of her promise.

So finding, our decree must be in favor of the plaintiff upon the equitable issue raised by the supplemental affidavit of defense and the answer thereto by plaintiff. Let a decree to that effect be submitted.