**LONE STAR CEMENT CORPORATION v. SWARTWOUT et al. (two cases).**

**In re RICHMOND LUMBER CO.**

Nos. 4233, 4247.

Circuit Court of Appeals, Fourth Circuit.

Jan. 4, 1938.

Before PARKER and SOPER, Circuit Judges, and COLEMAN, District Judge.

Walter M. Evans, of Richmond, Va., for appellant.

William A. Moncure, Jr., of Richmond, Va., for appellees.

SOPER, Circuit Judge.

The Lone Star Cement Corporation appeals from a decision of the District Court rendered in the bankruptcy proceeding of the Richmond Lumber Company, Inc., in which the claim of the Cement Corporation that it held an assignment of certain moneys and accounts receivable of the Lumber Company was denied. The Lumber Company had been engaged in the building material and supply business upon a considerable scale. On or about September 10, 1935, it entered into an oral contract to purchase from the Cement Corporation the cement that the Lumber Company would need to comply with a contract between it and the Works Progress Administration of the federal government. At that time the Cement Corporation, knowing that the Lumber Company was in a precarious financial condition, was unwilling to sell the goods on open account, and it was therefore orally agreed that the cement to be furnished by the Cement Corporation would be used only by the Lumber Company to comply with its government contract, and that the money received in payment from the government, less the profit accruing to the Lumber Company from the transaction, would be applied solely to the payment of the Cement Corporation's account.

The terms of this contract were performed by both parties. Subsequently, similar agreements were made between the corporations with reference to cement needed for several other WPA projects upon which the Lumber Company had become the successful bidder. Under these contracts, the Cement Corporation furnished merchandise to the Lumber Company until January 16, 1936, when shipments ceased because the Lumber Company was delinquent in its payments. The Lumber Company was then indebted to the Cement Corporation in the sum of $1,931.78, all of which except $286.91 represented goods supplied to the WPA projects. On March 10, 1936, at a conference between the parties it transpired that the Lumber Company had collected in full from the government but had used the proceeds to meet its pay rolls and other operating expenses. The Cement Corporation was therefore unwilling to continue shipments of material without some assurance not only that it would receive payment for the past indebtedness but that the Lumber Company would pay for future shipments of goods for

WPA projects out of moneys paid to it by the government as soon as received. Accordingly, the Lumber Company renewed its oral promise to apply moneys received from the United States to the payment for material furnished on the federal projects. It also paid the sum of $505.36 on account, and promised to pay the balance of the debt from the proceeds of certain accounts receivable recorded on ledger sheets exhibited to representatives of the Cement Corporation with the statement that payment thereof was expected in three or four weeks in amounts much more than sufficient to pay the past-due indebtedness. The accounts exhibited aggregated the sum of approximately $7,600, but the evidence does not definitely indicate the number or identity of the accounts except as to three, aggregating approximately $6,400.

The accounts receivable on the ledger sheets were not marked with the name of the Cement Corporation; nor was there any other writing indicating that they had been assigned to the Cement Corporation. The debtors were not notified that the accounts had been assigned, and no other attempt was made to restrict or limit the control of the Lumber Company over the accounts or the proceeds thereof. Dependence was placed solely on the promise of the Lumber Company, although it had previously failed to keep its former promise of a similar character. During the whole period under consideration, the Lumber Company was believed by the parties to the agreements and to the trade generally to be insolvent, and was in fact in such a condition.

Subsequent to the agreement of March 10, 1936, the Cement Corporation resumed shipments, and when the petition in bankruptcy was filed on May 22, 1936, an added debt of $1,027.30 had been accumulated. During the same period the Lumber Company collected all the money due it by the government on WPA accounts, and also the sum of $3,129.87 upon the three accounts receivable above mentioned, but paid no part of these moneys to the Cement Corporation. Its indebtedness to the Cement Corporation was however reduced by the sum of $479.70 through the return of cement sacks, so that the balance due at the date of bankruptcy was $1,974.02. A lien is claimed for the payment of $1,959.31 of this amount; the balance being represented by goods supplied for other than government projects, less credits allowed for the return of cement sacks.

The Cement Corporation claims that the agreements described created (1) an equitable assignment of the moneys received by the Lumber Company from the United States, impressing them with an equitable lien to secure the payment of the debt, and (2) an assignment of the accounts receivable above described impressing a lien upon them and upon such proceeds thereof as may have been collected or may hereafter be collected by the bankrupt or the representatives of the bankrupt estate.

So far as the claim relates to moneys collected by the Lumber Company before bankrupcy, little need be said because the record fails to show that anything came into the hands of the receiver or trustee in bankruptcy to which the asserted lien could attach. East Side Packing Co. v. Fahy Market, 2 Cir., 24 F.2d 644; Spellman v. Bankers' Trust Co., 2 Cir., 6 F.2d 799. It would also seem to be clear that the claim must fall in so far as it constitutes an attempt to secure preferential payment of an antecedent indebtedness through a contract creating an assignment of the accounts receivable or imposing a lien thereon executed at a time less than four months before bankruptcy when the debtor was known to be insolvent. The transaction of March 10, 1936, seems to have involved two elements; a promise by the debtor to pay his past indebtedness from the proceeds of the accounts receivable, and a promise by the debtor to pay for the goods to be subsequently shipped out of the proceeds of the sales to the WPA. In this view, no new consideration was given for the promise to pay the existing debt out of the accounts receivable, and the claim would be barred by section 60b of the National Bankruptcy Act, as amended, 11 U.S.C.A. § 96(b).

On the other hand, if it be assumed, as the claimant contends, that its promise to resume and continue the shipments was given only because the debtor made both of the promises above described and that thereby the claimant gave a new consideration sufficient to support an assignment or a lien, the claim must nevertheless be denied for a reason that goes to the heart of the transaction. There was no valid assignment of the accounts receivable. No particular phraseology is required to effect an assignment, and it may be either in oral or written form; but the intent to vest in the assignee a present right in the thing assigned must be manifested by some oral or written word or by some conduct signifying a relinquishment of

control by the assignor and an appropriation to the assignee. Benedict v. Ratner, 268 U.S. 353, 45 S.Ct. 566, ·69 L.Ed. 991; Chapman v. Emerson, 4 Cir., 8 F.2d 353; In re Almond-Jones Co., D. C., 13 F.2d 152, affirmed as Union Trust Co. v. Peck, 4 Cir., 16 F.2d 986; In re Saxon Coffee Co., D.C., 22 F.2d 999; In re Fergusson Drug Co., D. C., 19 F.Supp. 206; Parker v. Meyer, 4 Cir., 37 F.2d 556; Farmers' Bank v. Hayes, 6 Cir., 58 F.2d 34, 37.

In harmony with these requirements, it is generally held that a mere agreement to pay out of a particular fund does not constitute an assignment of the fund or any part thereof to the promisee, because it amounts only to a mere promise to pay, and does not meet the test of an intention on the part of the assignor to give and of the assignee to receive present ownership of the fund. Christmas v. Russell, 14 Wall. 69, 20 L.Ed. 762; State Central Sav. Bank v. Hemmy, 8 Cir., 77 F.2d 458; B. Kuppenheimer & Co. v. Mornin, 8 Cir., 78 F.2d 261, 101 A.L.R. 75; Pratt Lumber Co. v. T. H. Gill Co., D.C., 278 F. 783; Williston on Contracts, § 428. There can be no doubt that the transaction in the pending case was in this class. The facts recited lead only to this conclusion and the understanding of the parties compels the same result. The situation prevailing at the conference of March 10, 1936, was fairly summed up by a witness for the claimant in the following words: "I might say that the intent and purpose of displaying these accounts due the lumber company was for the purpose of showing the representatives of the cement company that Richmond Lumber Company had a considerable amount of good accounts receivable due them, at that time and that when money was paid to the lumber company from these accounts that they could and would be used for the purpose of paying the cement company on its bill."

■ The rights of the parties under the contract of March 10, 1936, are to be determined by the law of Virginia where the instrument was made, and we have been referred to the decisions of the Supreme Court of that state bearing upon assignments of choses in action and of promises to pay out of a particular fund. We find, however, no conflict between the courts of the state and the decisions of the federal courts, but, on the contrary, that the rules as to the requisites of a valid transfer and the ineffectiveness of a promise to pay out of a particular fund to create a valid assignment are as strictly enforced in Virginia as elsewhere. See Hicks v. Roanoke Brick Co., 94 Va. 741, 27 S.E. 596; Evans v. Rice, 96 Va. 50, 30 S.E. 463; Rinehart & Dennis Co. v. McArthur, 123 Va. 556, 96 S.E. 829; Coffman v. Liggett's Adm'r, 107 Va. 418, 59 S.E. 392. We find nothing in conflict with our conclusion in Malarkey v. Ballard, 137 Va. 631, 120 S.E. 245; Didier v. Patterson, 93 Va. 534, 25 S.E. 661, or Mathews v. Bond, 146 Va. 158, 135 S.E. 689, upon which the appellant particularly relies.

■ The theory of the claimant is that the agreement of March 10, 1936, amounted to a valid assignment of the accounts receivable which gave rise to an equitable lien thereon for the payment of its debt. There was no valid assignment, as we have seen, and it would seem to follow that there was no lien. The claimant, however, relies on Ingersoll v. Coram, 211 U.S. 335, 29 S.Ct. 92, 53 L.Ed. 208, and Barnes v. Alexander, 232 U.S. 117, 34 S.Ct. 276, 58 L.Ed. 530, in which it was held, without reference to the subject of assignments, that an equitable lien may arise from an agreement between attorney and client that the attorney's fee shall be paid out of a fund to be secured by the attorney's services. There is a distinction between a valid equitable assignment, creating a present right in the assignee, and an equitable lien which may arise under some circumstances from a promise to pay a debt in the future out of a particular fund. See In re Stiger, D.C., 202 F. 791, affirmed 3 Cir., 209 F. 148; Rhinehart v. Victor Talking Mach. Co., D. C., 261 F. 646; Williston, Contracts, §§ 428, 429. Professor Williston points out that a valid assignment is created by an agreement authorizing an attorney to collect the fund and pay himself by retaining his fee; but only a contract right is effected if the fund is to come into the hands of the client and he is to make the payment; and that whether such a right, though not amounting to an assignment, gives rise to an equitable lien is substantially the same question that arises whenever there is a contract to transfer in the future personal property not ordinarily the subject of the specific performance. We are in accord with his suggestion that the decision of the question involves the propriety of subordinating general creditors to a variety of equitable liens created by contracts referring to specific property, and that there seems to be no reason to distinguish promises to pay money from a specific fund when received from promises to deliver specific goods when manufactured.

The decisions in Ingersoll v. Coram and Barnes v. Alexander, supra, related specifically to the creation of equitable liens for attorney's fees, and have not been generally considered as authority for the establishment of an equitable lien under circumstances like those in this case. In B. Kuppenheimer & Co. v. Mornin, 8 Cir., 78 F.2d 261, 264, 101 A.L.R. 75, the following statement in regard to these cases was made:

"The very strict requirements set down in the Christmas Case, supra [Christmas v. Russell, 14 Wall. 69, 71, 20 L.Ed. 762] as necessary to the creation of an equitable assignment, have confessedly been broadened by subsequent decisions of the Supreme Court. But for the major part, this mellowing of component elements has occurred, either in cases involving contingent fees of attorneys, or in cases of liens on personal property put up and held as collateral security. See Ingersoll v. Coram, 211 U.S. 335, 29 S.Ct. 92, 53 L.Ed. 208; Walker v. Brown, 165 U.S. 654, 17 S.Ct. 453, 41 L.Ed. 865; Barnes v. Alexander, 232 U.S. 117, 34 S. Ct. 276, 58 L.Ed. 530. Fairly good reasons for putting aside the strict requirements of the doctrine of equitable assignments can be found in the case of an asserted lien by a lawyer for his fee, on the money recovered as the result of litigation, for the efforts of the lawyer bring the fund into existence. In such case it may be said, arguendo, that the lawyer asserting the lien is, in a manner of speaking, a joint adventurer, and such cases scarcely belong in the category of equitable assignments. In the case of collateral pledged to secure a debt, possession usually follows, and so notice sufficient to induce inquiry is given to the world. * * *

"Many cases are to be found sustaining the rule that a promise to pay out of a particular fund, when it shall come into existence, does not create an equitable assignment of that fund. As counsel for defendants on argument aptly said, in effect, that business and commerce will be greatly harmed, hamstrung, and impeded if every agreement of an Iowa farmer to pay a debt out of a crop of corn, when he shall have sold the corn, is to be held to be an equitable assignment of the proceeds of such corn."

On the appeal from the District Court in case No. 4247, the judgment is affirmed. The appeal to superintend and revise in case No. 4233 is dismissed.

Case No. 4247 affirmed.

Case No. 4233 dismissed.