[Cite as *In re M.A.P.*, 2013-Ohio-655.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| IN THE MATTER OF: | : | CASE NOS. CA2012-08-164 |
| M.A.P. | : | CA2012-08-165 |
| | : | O P I N I O N<br>2/25/2013 |
| | : | |
| | : | |


APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JN2009-0456


Michael T. Gmoser, Butler County Prosecuting Attorney, Lina N. Alkamhawi, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for Butler County Children Services

Dawn S. Garrett, 7865 Paragon Road, Suite 107, Centerville, Ohio 45459-2748, for appellant, S.V.

Manuel Hernandez, 810 Sycamore Street, Suite 511, Cincinnati, Ohio 45202, for appellant, G.H.

Tracy A. Washington, 10 Journal Square, 3rd Floor, Hamilton, Ohio 45011, guardian ad litem


**PIPER, J.**

{¶ 1} Appellants, the biological parents of M.P. (Mother and Father), appeal the

decision of the Butler County Court of Common Pleas, Juvenile Division, granting permanent

custody of their child to the Butler County Department of Job and Family Services (BCDJFS or the Agency).

{¶ 2}  On December 15, 2009, BCDJFS filed a complaint alleging abuse, neglect, and dependency.  A shelter care hearing was held two days later, and a magistrate granted an emergency order, granting temporary custody of M.P. to BCDJFS.  The magistrate also issued a no-contact order between M.P. and her parents.  Mother and Father were both present at the hearing, and were represented by the same counsel.  The magistrate questioned the prudence of having one attorney represent both Mother and Father, but counsel stated that no conflict was present, and that joint representation was warranted. Mother and Father continued to be represented by the same attorney.

{¶ 3}  On February 3, 2010, the magistrate held a full hearing on the Agency's complaint of abuse, neglect, and dependency.  The Agency filed the complaint after a local hospital reported that M.P. had been brought in by her parents because of a fever and incessant crying.  X-rays revealed that M.P. had suffered multiple bone fractures that had occurred at different times and that were healing at different intervals.  At five months old, M.P. had several broken bones, including four broken ribs, a spinal fracture, left and right femur factures, and left and right tibia fractures.  She also had a bruise on her abdomen. Upon her placement in foster care, M.P. had to be handled in a certain manner to avoid causing her pain when being lifted, changed, and carried.  M.P.'s various injuries took four to six weeks to heal, and the child attended physical therapy for seven months or more to fully recover, and was developmentally delayed in areas such as crawling because of the injuries.

{¶ 4}  The child also suffered other physical impairments.  She was forced to wear a helmet for several months because her head was flat from the amount of time she spent lying down.  M.P. also had a flap on her tongue that did not allow her to lift her tongue in order to eat anything other than liquid from a bottle.  Mother and Father knew about the condition

upon the child's birth and were advised to rectify the situation immediately, but did not do anything to remedy M.P.'s physical impairment. Instead, the foster family took the child to have her tongue repaired so that she could begin to eat solid food.

{¶ 5} At the adjudication hearing, Mother and Father stipulated that M.P. was an abused child, and allegations that the child was neglected and dependent were dismissed. Although Mother and Father stipulated to the abuse, neither articulated which party was responsible for the abuse nor indicated how the child had received such extensive injuries while in their care. Part of the stipulation of abuse included the express statement that no perpetrator be named.

{¶ 6} Father stated that he had no knowledge of how M.P. was injured, but did state that on one occasion, he accidentally dropped the child onto a store parking lot while trying to remove the child from her car seat. Although Father stated the dropping was accidental, he admitted that he did not take the child to the hospital for several days, and finally took her only because she cried every time they picked her up. Mother, though she knew that Father had allegedly dropped the child, also failed to seek medical care for the child.

{¶ 7} After M.P. was adjudicated abused, Mother and Father were given a case plan by BCDJFS in order to facilitate reunification. The case plan included counseling for both parents, as well as parent education classes. Mother and Father worked on aspects of the case plan in the months that followed the adjudication hearing. The magistrate also lifted the no-contact order and Mother and Father were permitted to have supervised visits with the child.

{¶ 8} On February 10, 2011, the Agency filed for permanent custody of M.P. During a pretrial hearing on the permanent custody motion, the magistrate once again raised concerns regarding a possible conflict arising from the same counsel representing both Mother and Father. Shortly thereafter, the magistrate appointed new counsel for Mother.

Father retained the same counsel after Mother acknowledged and waived any conflicts in relation to counsel continuing to represent Father.

{¶ 9} Father asked the agency that his adult son and his son's girlfriend be considered as a placement option for M.P. However, the Agency conducted a home study and found that placement with the son would not be possible because the Agency was not able to complete a comprehensive background check due to the son's illegal-alien status and not having fingerprints on file. Also, the son resided with Mother and Father part of the time, which was an unsafe environment for the child. The Agency also questioned who would care for the child if the son or the son's girlfriend were working. None of Mother or Father's relatives from Mexico filed any motions regarding custody of M.P., even though they were aware that the Agency had obtained temporary custody of the child. The only help offered by Mother's family was to advise Mother to seek assistance from the Mexican Consulate. When Mother contacted the Consulate, they advised her that there was nothing they could do to help.

{¶ 10} Both Mother and Father are Mexican and have issues speaking and understanding English. The magistrate appointed interpreters before and during the adjudication hearing and permanent custody trial, but none were requested during the shelter care hearing, as Mother and Father's counsel indicated that neither party required an interpreter because they agreed that the child had injuries and would require removal from their home. However, the magistrate appointed different interpreters who aided Mother and Father during the adjudicatory and permanent custody hearings. One interpreter appointed during the permanent custody hearing was later replaced because there were questions as to whether the interpreter was accurately conveying Mother and Father's testimony. However, the other previous and subsequent interpreters all translated accurately at the various stages of the proceedings.

{¶ 11} During the permanent custody trial, the magistrate heard evidence of M.P.'s injuries and the physical challenges she faced as a result. Father reiterated that he had dropped the child on the parking lot pavement when trying to remove her from her car seat. Mother indicated, for the first time, that Father was abusive toward her, had dropped the child on multiple occasions, and grabbed the child from her arms during an argument. However, Mother also testified that she never saw Father harm the child, and that she did not know how the child received her injuries.

{¶ 12} The magistrate also heard evidence that M.P. began living with the foster family in December 2009, has thrived since being placed there, and is bonded with the foster family. The foster mother also testified that the family wants to adopt M.P.

{¶ 13} The magistrate heard evidence that Mother and Father worked cooperatively with the Agency to complete the case plan, and that they participated in visits with the child. The magistrate heard evidence that the child reacted negatively to the visits at first, such as becoming fussy, changing the expression on her face, and even pulling away from Mother when she tried to touch her. However, the child became more relaxed in Mother and Father's presence as the visits progressed over the next nine to ten months. While the magistrate heard evidence that Mother and Father complied with the case plan put in place to facilitate reunification, several obstacles remained that hindered reunification because neither Mother nor Father would indicate how M.P. had been injured.

{¶ 14} The Agency's caseworkers testified that reunification was too high a risk based upon the fact that the source of the child's extensive injuries remained undetermined. Without knowing how the injuries occurred, the Agency could not create a holistic case plan to combat all issues that may have led to the injuries, such as Mother or Father's possible anger management issues, psychological issues, substance abuse, or family dynamics. Without knowing the underlying cause of the child's injuries, the originally formulated case

plan could not address the main issue facing the child: how to protect her from future injury. The child's guardian ad litem (GAL) also suggested that BCDJFS receive permanent custody because of the risk of placing the child with Mother and Father without knowing that the issues leading to the child's injuries had been addressed successfully.

{¶ 15} The magistrate granted the Agency's permanent custody motion, and Mother and Father's parental rights were terminated. Both parents then filed objections. The juvenile court overruled the objections and adopted the magistrate's findings and conclusions in full. Mother and Father now appeal the juvenile court's decision granting the Agency permanent custody. Although Mother and Father filed separate appeals, we will address the appeals together for the purposes of writing this single opinion, and address combined arguments whenever possible for ease of discussion.

{¶ 16} Father's Assignment of Error No. 1:

{¶ 17} THE TRIAL COURT ERRED IN GRANTING THE BUTLER COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES, CHILDREN SERVICES DIVISIONS' MOTION FOR PERMANENT CUSTODY AS IT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE TO GRANT IT.

{¶ 18} Mother's Assignment of Error No. 3:

{¶ 19} THE COURT ERRED AS A MATTER OF FACT AND LAW AND ABUSED ITS DISCRETION WHEN IT FOUND TERMINATING THE PARENTAL RIGHTS OF APPELLANT TO BE IN THE CHILD'S BEST INTERESTS AND TERMINATED THE PARENTAL RIGHTS OF APPELLANT BECAUSE SUCH WAS NOT THE ONLY MEANS OF OBTAINING A LEGALLY SECURE PLACEMENT FOR THE CHILD AND/OR BECAUSE PERMANENT CUSTODY WAS NOT IN THE CHILD'S BEST INTERESTS.

{¶ 20} Mother's Assignment of Error No. 4:

**{¶ 21}** THE COURT'S DECISION AND ORDER OF PERMANENT CUSTODY AND DENIAL OF LEGAL CUSTODY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE TRIAL COURT'S FINDINGS AND THE EVIDENCE PRESENTED FAILED TO MEET THE REQUISITE CLEAR AND CONVINCING STANDARD.

**{¶ 22}** In Father's first and Mother's third and fourth assignments of error, they argue that the juvenile court erred in granting permanent custody to BCDJFS and in terminating their parental rights.

**{¶ 23}** Before natural parents' constitutionally protected liberty interests in the care and custody of their child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is limited to whether sufficient credible evidence exists to support the juvenile court's determination. *In re Starkey,* 150 Ohio App.3d 612, 2002-Ohio-6892, ¶16 (7th Dist.). A reviewing court will reverse a finding by the juvenile court that the evidence was clear and convincing only if there is a sufficient conflict in the evidence presented. *In re Rodgers*, 138 Ohio App.3d 510, 520 (12th Dist.2000).

**{¶ 24}** Pursuant to R.C. 2151.414(B)(1), a court may terminate parental rights and award permanent custody to a children services agency if it makes findings pursuant to a two-part test. First, the court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). Second, the court must find that any of the following apply: the child is abandoned; the child is orphaned; the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; or where the preceding three factors do not apply, the child

cannot be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(B)(1)(a), (b), (c) and (d); *In re E.B.,* 12th Dist. Nos. CA2009-10-139; CA2009-11-146, 2010-Ohio-1122, ¶ 22.

**{¶ 25}** The juvenile court found by clear and convincing evidence, and Mother and Father do not deny, that M.P. has been in the temporary custody of BCDJFS for more than 12 months of a consecutive 22-month period as of the date the Agency filed the permanent custody motion because the child had been placed with the foster family for 14 months. However, Mother and Father dispute the juvenile court's finding that granting permanent custody of M.P. to the Agency is in the child's best interest.

**{¶ 26}** R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing, the court shall consider all relevant factors, including, but not limited to the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**{¶ 27}** With respect to the interaction of the child with her parents and foster caregivers as set forth in R.C. 2151.414(D)(1)(a), the juvenile court found that M.P. was an

abused child while in Mother and Father's care. The juvenile court considered that the child had numerous skeletal injuries, that when discovered by x-ray, were in various stages of healing. The child suffered four rib fractures, a spinal fracture, left and right femur factures, and left and right tibia factures. The juvenile court noted that the sources of M.P.'s extensive injuries had still not been determined. During the permanent custody hearing, Father stated that he had dropped the child on a paved surface when he tried to remove her from her car seat. Despite Father's testimony that he dropped the child on one occasion, her injuries indicated that the child had been victim to several injurious occurrences that happened at various times in her young life.

{¶ 28} The juvenile court also noted that Mother testified that Father told her that the child had either fallen or had been dropped on more than one occasion while in his care. Mother also testified that Father grabbed the child from her arms after he became angry that Mother was holding the child rather than keeping her in the crib. However, Mother admitted that she did nothing to seek medical treatment for the child, out of fear that she would be reported to authorities or that the state would take the child from her care. However, Mother indicated that only she and Father had provided care for the child, and neither Mother nor Father could offer any explanation as to how the child could have been injured other than by their own actions. As stated by the juvenile court, "once the state became involved, the parents formed a united front that, for all intents and purposes, effectively prevented the system from obtaining the information it needed to make a meaningful attempt at addressing the cause of the removal of this child from their care."

{¶ 29} The juvenile court also found that M.P. has been in the foster family's custody and care since December 2009, and that she is bonded to them and doing well in their custody. The foster family facilitated M.P.'s healing, and has also provided for her ongoing health concerns regarding her flattened head and impaired tongue. When M.P. first was

placed with the foster family, she had to be held in a certain position to avoid causing her pain. M.P.'s extensive injuries took four to six weeks to heal, and she received seven months of physical therapy to help heal. She was also developmentally delayed in areas such as crawling, and she had to wear a helmet because her head was flattened when she arrived in foster care.

{¶ 30} Since her time with the foster family, M.P. has developed rapidly. She is now "a happy, playful" two-and-one-half-year-old child, who considers her foster home to be her own. The child has bonded with her two foster siblings, and has very close relationships with them. The child is also doing well in the day-care program she attends while the foster mother works part-time. The record indicates that the child is integrated into the foster family, and the family wants to adopt the child.

{¶ 31} With respect to R.C. 2151.414(D)(1)(b), the juvenile court did not take into consideration the child's wishes because at her age, the child is too young to indicate her desires. However, the juvenile court noted that the child's GAL recommended placement of the child in the permanent custody of BCDJFS.

{¶ 32} With respect to R.C. 2151.414(D)(1)(c), the juvenile court found, and Mother and Father agree, that M.P. has been in the custody of BCDJFS for more than 12 months of a consecutive 22-month period, and had been with the foster family for 14 months as of the time of the permanent custody motion. Moreover, the juvenile court noted that the child's time in foster care has comprised "the majority of her life."

{¶ 33} With respect to R.C. 2151.414 (D)(1)(d), the juvenile court found that M.P. needs a legally secure permanent placement and that such placement cannot be achieved without a grant of permanent custody to BCDJFS. The juvenile court specifically found that no relatives or nonrelatives have filed motions requesting custody of the child. The court therefore considered whether Mother or Father could provide the child with a legally secure

placement, and determined that they could not because either Mother or Father (or Mother and Father both) abused the child extensively, and the child's health and safety could not be guaranteed under the care of either of them.

{¶ 34} Although Mother and Father submitted evidence that they had abided by the terms of the case plan and that their supervised visits with the child went well, the juvenile court noted that R.C. 2151.412(H) states that in the review of a case plan, "the child's health and safety shall be the paramount concern." As both Mother and Father admitted that they were the child's only caregivers, and would not otherwise explain how the child received her extensive injuries, placing the child with Mother or Father would be contrary to her health and safety concerns and therefore also contrary to the overriding goal of the case plan.

{¶ 35} During a review hearing in 2010, the magistrate very clearly indicated the importance of understanding how the child was injured. However, Mother and Father's counsel indicated that "they would not * * * talk about what happened, what the incident was, what did or did not happen." The court then warned the parties that without knowing how the injuries occurred, it would be very difficult to determine whether placing the child back with one or both of her parents was in the child's best interests, and that "having no information is not an option." Despite the magistrate's warning early during the proceedings, neither Mother nor Father ever gave the court the information it needed to determine that the circumstances leading to the child's injuries would never again occur.

{¶ 36} During the permanent custody hearing, the caseworker assigned to the case stated the reason the Agency was seeking permanent custody of the child:

> Our problem is we don't know who caused the injuries to [M.P.] We don't have a definite answer of how those injuries occurred. The injuries were severe; there were multiple breaks, multiple fractures, and that's alarming to the agency. We're … Not knowing who caused the injuries, not knowing if the proper services have been offered to the parents, if the parents caused the injuries, if they allowed someone around the child that

caused the injuries, there's just … there's still many unanswered questions that the agency cannot… in the best interest of [M.P.] does not feel comfortable putting [M.P.] back in that home.

As the juvenile court found, and we agree, returning the child to her parents would place her in "an environment where she was seriously injured as a helpless infant."

{¶ 37} It is possible that only one parent is responsible for M.P.'s injuries. However, the record indicates that both parents were aware that M.P. was in pain for several days before they finally took her to the hospital. Even if only one parent was at fault for the child's injuries, returning the child to the other parent would not be warranted because Mother and Father continue to reside together and they are each other's only support system in this country. During the permanent custody hearing, the caseworker testified that Mother stated that she did not know if she could trust Father, and that Mother stated she "didn't know" how to ensure the child's safety if M.P. returned to Mother and Father.

{¶ 38} The juvenile court also noted that Mother and Father are undocumented aliens, with limited resources. While the juvenile court noted that both Mother and Father love the child and have an attachment to her, neither have a support system in place, save Father's adult son who lives in the area. While it would be possible for Mother to return to Mexico with the child to live closer to family, the juvenile court noted that the child is an American citizen, who had been fully ingratiated into an American family. Therefore, the juvenile court found that the only way to obtain legally secure placement was to grant permanent custody to the Agency.

{¶ 39} The juvenile court noted that of the factors listed in R.C. 2151.414(E) regarding whether it was possible to place the child with her parents, subsections eight and 15 applied. The juvenile court first took into consideration whether "the parent has repeatedly withheld medical treatment * * * from the child when the parent has the means to provide the treatment," and found that Mother and Father withheld medical treatment repeatedly. As

previously discussed, the medical diagnosis of M.P.'s broken bones indicated that she suffered several injuries, over an extended period of time. M.P. also had a bruise on her abdomen which Mother saw every time she changed the child's diapers. However, neither Mother nor Father took M.P. to the hospital to address these medical concerns. Nor did Mother or Father seek medical attention for M.P.'s flattened head or her tongue impairment.

{¶ 40} While Mother testified that she was aware of M.P.'s medical conditions, she stated that she did not take the child for medical attention because she feared being reported to authorities or having the child removed from her care. However, there is no indication in the record that Mother or Father lacked the necessary means to provide medical care for M.P. had they chosen to take her to the doctor.

{¶ 41} The juvenile court further noted that R.C. 2151.414(E)(15) directs a court to consider whether "the parent has committed abuse" as well as whether the "likelihood of recurrence of the abuse * * * makes the child's placement with the child's parent a threat to the child's safety." The juvenile court found this statutory section applicable to the current case, and noted:

> although it remains unclear as to which parent abused this child, either mother did so and is now attempting to cast the blame on father, or father did so, and mother was complicit in attempting to avoid official involvement of the father and her child in the criminal justice and child protection systems, respectively. Neither of those conclusions leads logically to a conclusion that is favorable to the parents of this child.
>
> The nature of the abuse of this child was and is horrendous. Her arms and legs were broken. She had broken ribs and a fractured spine. When she would be picked up she would cry out in pain and she suffered in that manner over many weeks. When all of this happened, she was five months (or less) of age. Both parents neglected to obtain medical care for her in a timely fashion.

{¶ 42} After reviewing the record, we find sufficient credible evidence to support the juvenile court's decision to grant permanent custody of M.P. to BCDJFS. Mother's third and

fourth and Father's first assignments of error are overruled.

{¶ 43} Father's Assignment of Error No. 2:

{¶ 44} THE TRIAL COURT ERRED IN GRANTING THE BUTLER COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES, CHILD SERVICES DIVISIONS' MOTION FOR PERMANENT CUSTODY AS REASONABLE EFFORTS WERE NOT MADE TO REUNIFY THE CHILD WITH A FAMILY MEMBER.

{¶ 45} Father argues in his second assignment of error that the juvenile court erred in granting permanent custody to BCDJFS because the Agency had not made reasonable efforts to place the child with a family member.

{¶ 46} Except for a few narrowly defined statutory exceptions, R.C. 2151.419 requires a children's service agency to make reasonable efforts to reunify a family prior to the termination of parental rights.[1] *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 21. While the court is not required to make a reasonable efforts determination at a hearing on a motion for permanent custody, this finding must have been made at other stages of the child-custody proceeding. *Id.* at ¶ 42. In this case, the trial court made reasonable efforts findings after hearings both prior to the hearing on the permanent custody motion and in its decision granting permanent custody.

{¶ 47} Essentially, Father argues that the Agency did not make reasonable efforts because it did not investigate whether placing the child with a family member in Mexico was possible. However, and as this court has stated, "in determining whether the agency made reasonable efforts to prevent the removal of the child from the home, the issue is not whether

---

1. One such section, R.C. 2151.419(A)(2)(b), states that the court is not required to make the finding of reasonable efforts when "the parent from whom the child was removed has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food." Although the juvenile court determined that Mother and Father had repeatedly withheld medical treatment despite having the means to provide such, the court did not make that finding specific to R.C. 2151.419(A)(2)(b) so that this court will review the juvenile court's determination of reasonable efforts as is required by R.C. 2151.419(A)(1).

the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute." *In re K.L.*, 12th Dist. No. CA2012-08-062, 2013-Ohio-12, ¶ 18, citing *In re K. M.,* 12th Dist. No. CA2004-02-052, 2004-Ohio-4152, ¶ 23. "Reasonable efforts" does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible. *In re K.L.* at ¶ 18.

{¶ 48} The record indicates that the Agency made reasonable efforts to reunite the child with her parents, or even another family member. As the juvenile court noted, the Agency provided Mother and Father with evaluative services, counseling, parenting education, and case planning. BCDJFS also performed a home study on Father's grown son, but the son failed the home study because the Agency was not able to complete a comprehensive background check due to son's illegal alien status, and not having finger prints on file. Also, the son resided with Mother and Father part of the time, which was an unsafe environment for the child. The Agency also questioned who would provide care for the child if the son or the son's girlfriend were working. It is unreasonable for Father to expect the Agency to find relatives in another country and determine whether such placement would be suitable for the child. This is true, especially given that no other family member came forward as a possible placement, and not a single family member moved for custody of the child, even though they had knowledge that the child had been removed from Mother and Father's home. In fact, the only thing Mother's family suggested that Mother do was contact the Mexican Consulate for assistance, which the Consulate declined to give.

{¶ 49} Throughout this case, the juvenile court determined that the Agency was making reasonable efforts to reunite the child with family members, and made the same finding when making its permanent custody determination. The trial court did not err in finding such, and Father's second assignment of error is overruled.

{¶ 50} Father's Assignment of Error No. 3:

{¶ 51} FATHER WAS DENIED HIS RIGHT TO DUE PROCESS AND EQUAL PROTECTION AS INTERPRETERS WHO WERE NOT PROPERLY QUALIFIED AND/OR BIASED WERE USED THROUGHOUT THE PROCEEDINGS.

{¶ 52} Mother's Assignment of Error No. 2:

{¶ 53} MOTHER WAS DENIED HER STATUTORY AND CONSTITUTIONAL RIGHTS TO DUE PROCESS, EFFECTIVE ASSISTANCE OF COUNSEL, CONFRONTATION OF WITNESSES AND EQUAL TREATMENT, MANDATING THAT THIS MATTER BE REVERSED AND REMANDED.

{¶ 54} In Father's third assignment of error and Mother's second assignment of error, they argue that their due process rights were violated because the court did not appoint skilled interpreters at the shelter care and permanent custody hearings.

{¶ 55} According to R.C. 2311.14(B), "before entering upon official duties, the interpreter shall take an oath that the interpreter will make a true interpretation of the proceedings to the party or witness, and that the interpreter will truly repeat the statements made by such party or witness to the court, to the best of the interpreter's ability." Evid.R. 604 also states, "an interpreter is subject to the provisions of these rules relating to qualification as an expert and the administration of an oath or affirmation to make a true translation." However, failure to object to a court's failure to administer an oath at the beginning of the interpreter's involvement or qualify the interpreter waives that issue on appeal. *State v. Rosa*, 47 Ohio App.3rd 172 (8th Dist.1988).

{¶ 56} As previously stated, Mother and Father are Mexican and speak Spanish rather than English. While there was no interpreter present during the shelter care hearing, The record indicates that Mother and Father waived any argument regarding having an interpreter

present. Before the hearing began, the juvenile court noted that an interpreter was not present. Counsel for Mother and Father then stated, "Judge, they don't need an interpreter right now, Judge. We'll agree… I spoke with not only them but also with Children Services and the Prosecutor, and the baby does have injuries that would make the temporary custody to Butler County essential." Therefore, Mother and Father agreed to proceed with the shelter care hearing without an interpreter, and waived on appeal any possible error.

{¶ 57} The record indicates that the court appointed an interpreter at every stage of the proceedings after the shelter care hearing, including skilled interpreters for the adjudicatory hearing wherein Mother and Father stipulated that the child was abused. The interpreter verified that Mother and Father knew what they were doing, and wished to stipulate to the abuse. The court also appointed two interpreters for the permanent custody hearing. The appointed interpreter who aided Mother and Father as witnesses was replaced after Father's testimony as if on cross-examination during the state's case was completed, as well as a portion of Mother's testimony, because there was some indication that the interpreter was not relaying the testimony verbatim. The magistrate neglected to administer the oath to the replacement interpreter at the moment the interpreter began to interpret Mother's testimony. However, the magistrate did administer the oath before the interpreter finished interpreting Mother's testimony.

{¶ 58} Mother and Father now argue that the magistrate erred by not performing the proper voir dire to determine whether the interpreter was qualified, and in not administering an oath to the second interpreter until after he had already interpreted some of Mother's testimony. However, Mother and Father did not object to the magistrate's failure to voir dire or to the delay in giving the oath. Nor did Mother and Father ask the magistrate to strike any testimony given with the aid of the first interpreter, nor did they object to the magistrate considering the testimony as originally taken. Therefore, Mother and Father have waived

these issues on appeal. Moreover, neither Mother nor Father objected to the magistrate not conducting a voir dire or waiting to administer the oath when they filed objections with the juvenile court. Therefore, they have also waived these issues on appeal. Juv.R. 40(3)(b)(iv).

{¶ 59} Because Mother and Father failed to object to the interpreter issue, we will review for plain error. Plain error exists where there is an obvious deviation from a legal rule that affected the party's substantial rights by influencing the outcome of the proceedings. *In re L.B.B.*, 12th Dist. No. CA2012-01-011, 2012-Ohio-4641, ¶ 8. "Plain error does not exist unless it can be said that but for the error, the outcome would clearly have been otherwise." *Id.*, citing *State v. Biros,* 78 Ohio St.3d 426, 436 (1997).

{¶ 60} After reviewing the record, the magistrate's failure to administer the oath to the replacement interpreter until later in the proceedings and qualify the interpreter as an expert did not amount to plain error. The overriding concern in this case has always been that the child had multiple broken bones by the time she was five months old. Mother and Father refused to disclose how the child received the injuries, and despite Mother's suggestion that Father's actions led to the injuries, neither party agreed to name a perpetrator. Instead, Mother and Father stood united during the pendency of the proceedings, and still resided together at the time of the permanent custody hearing. Nothing during the testimony of Mother or Father, whether or not it was translated word for word, indicated how the child received her injuries or that any environment created by Mother and Father would be safe for the child to return to.

{¶ 61} Specifically, Mother and Father suggest that the first interpreter did not understand the difference between the word "drop" or "fall" so that when Father testified that the child had been dropped while in his care, it could have actually been that the child fell while in his care. However, the magistrate noted that the child had either fallen or was dropped while in Father's care, thus taking into consideration how either verb/action would be

indicative of Father's ability to take care of the child while she was in his care. Regardless of whether the child fell or was dropped, the fact remains that neither Mother nor Father took the child to the hospital and repeatedly failed to seek medical attention for the child.

{¶ 62} Mother also takes issue with the fact that a BCDJFS worker, Claudine Recalde, testified regarding conversations she had with Mother and Father when the child's injuries were first reported to the Agency. Recalde, who is fluent in Spanish, was hired by the Agency in part to specifically work with Spanish-speaking clients. Her specific job titles include family resource specialist and Hispanic Liaison. Recalde testified that as a family resource specialist, she supervised the visits between M.P. and Mother and Father. Recalde also spoke with Mother and Father and the police during the investigation of the child's injuries. She described one instance where she was present, along with a detective, a BCDJFS caseworker, the doctor, and a hospital interpreter who was interpreting for the doctor. Recalde testified that the doctor told Mother of all of the child's injuries and Mother said that she did not know how the injuries could have occurred. Recalde testified that on another occasion, Father told police that M.P. fell out of her car seat onto the pavement at the grocery store. The majority of what Recalde testified to was therefore specific to either her own observations of Mother, Father, and the child during the supervised visitation, or regarded interactions with Mother and Father that had already been introduced on record through physical evidence or other testimony.

{¶ 63} While Mother argues that Recalde was not given the interpreter's oath or was not qualified as an expert, the record indicates that Recalde appeared as a witness for the state as an employee of the Agency and gave testimony regarding conversations she personally had with Mother and Father as part of her employment duties. She was not, however, called by the court to interpret Mother and Father's testimony as they gave it in court.

{¶ 64} As a witness, Recalde was permitted to recall the conversations she had with Mother and Father, and the events that occurred during the investigation of the child's injuries. In fact, the magistrate specifically directed Recalde to testify from her own memory of the events, and to inform the court if she was unable to answer a question from her own recollection. Recalde was subject to cross-examination, and Mother and Father could have challenged any of Recalde's testimony regarding the investigation if she was relaying events untruthfully or wrongfully based on any issues with interpreting Mother and Father's Spanish into English. Moreover, as a BCDJFS employee, just as any other caseworker, Recalde's testimony was judged by the magistrate regarding her credibility and what weight to give to her testimony.

{¶ 65} After reviewing the record, the results of the permanent custody hearing would not have been different had the magistrate administered the oath to the replacement interpreter immediately upon him taking over, had the trial court performed a vior dire, or had the testimony elicited through the dismissed interpreter been stricken from the record. As such, Mother's second and Father's third assignments of error are overruled.

{¶ 66} Mother's Assignment of Error No. 1:

{¶ 67} MOTHER WAS DENIED HER CONSTITUTIONAL RIGHTS TO DUE PROCESS AND EFFECTIVE ASSISTANCE OF COUNSEL, MANDATING THAT THIS MATTER BE REVERSED AND REMANDED.

{¶ 68} Mother argues in her first assignment of error that she received ineffective assistance of counsel because she did not have separate counsel during the shelter care and adjudicatory hearing when the child was adjudicated abused.

{¶ 69} The United States Supreme Court has stated that judicial scrutiny of an ineffective assistance claim must be "highly deferential * * *." *Strickland v. Washington,* 466

U.S. 668, 689, 104 S.Ct. 2052 (1984). The *Strickland* court also stated that a reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* The *Strickland* court established a two-part test which requires an appellant to establish that first, "his trial counsel's performance was deficient; and second, that the deficient performance prejudiced the defense to the point of depriving the appellant of a fair trial." *State v. Myers*, 12th Dist. No. CA2005-12-035, 2007-Ohio-915, ¶ 33, citing *Strickland*.

{¶ 70} Regarding the first prong, an appellant must show that counsel's representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S at 688. The second prong requires the appellant to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

{¶ 71} Mother argues that she was denied the right to effective counsel because she and Father had the same attorney at the beginning stages of the proceedings. Beginning with the shelter care hearing and continuing thereafter, the magistrate specifically questioned the prudence of one attorney representing both parents. However, Mother and Father specifically declined to have separate counsel appointed to represent Mother.[2] Counsel told the magistrate that there was no conflict in representing Mother and Father because "everyone seems to be on the same page, or consistent," and that if any conflicts arose, Mother could have separate counsel appointed.

{¶ 72} Mother now argues that the results of the permanent custody determination would have been different had she had separate counsel from the beginning. We disagree. Despite Mother and Father having the same counsel at the shelter care hearing, the record is undisputed regarding the child's injuries and that neither Mother nor Father would indicate

---

2. The record seems to indicate that Father retained the attorney who represented Mother and Father at the beginning of the proceedings.

who perpetrated the injuries. Even though Mother later testified that Father was abusive toward her, dropped the child on multiple occasions, and once grabbed the child from her arms during an argument, Mother also testified that she never saw Father do anything to cause the child's broken bones and that she did not know how the child sustained multiple broken bones and fractures.[3] The record indicates that the parents presented a united front, and questions still remain regarding the cause of the child's injuries.

{¶ 73} We would also note that at the adjudicatory hearing, Mother, herself, stipulated that the child was abused. Mother was asked directly whether she understood the nature of the stipulation and what impact stipulating to abuse would have. Mother stated that she understood what she was doing, and then stipulated that the child was abused. The magistrate then dismissed the neglect and dependency charges. However, even if Mother had her own counsel at the adjudicatory hearing, there is little doubt that the court would have found the child to be abused, dependent, *and* neglected because the evidence was undisputed that the child suffered from severe injuries, including a fractured spine, and that Mother did nothing to seek medical treatment for the child until much later.

{¶ 74} Moreover, Mother admitted that she left the child lying in the crib for extended periods of time, thus requiring the child to wear a helmet to protect her flattened head. Also, Mother indicated that she failed to seek the necessary surgery to have the child's tongue repaired. Having separate counsel, even if separate counsel would have persuaded Mother to testify to Father's abuse or dropping the child, would not have changed the fact that Mother failed repeatedly to protect the child and seek medical attention.

{¶ 75} Having reviewed the record, we do not find that Mother received ineffective assistance of counsel because she and Father were jointly represented at the shelter care or

---

3. During his testimony at the permanent custody hearing, Father admitted to putting his hands on Mother, when asked for more detail, Father asserted his Fifth Amendment right against self-incrimination.

adjudicatory phases of the proceedings.  As such, Mother's first assignment of error is overruled.

Judgment affirmed.


HENDRICKSON, P.J., and M. POWELL, J., concur.