381 So.2d 294 (1980)
HEALTH APPLICATION SYSTEMS, INC., Appellant,
v.
HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY and State of Florida Department of Health and Rehabilitative Services, a State Agency, Appellees.
No. NN-37.
District Court of Appeal of Florida, First District.
March 12, 1980.
*295 F. Perry Odom, C. Everett Boyd of Ervin, Varn, Jacobs, Odom & Kitchen, Tallahassee, for appellant.
M. Stephen Turner of Thompson, Wadsworth, Messer, Turner & Rhodes, Tallahassee, Marion R. Shepard, John M. McNatt of Mathews, Osborne, Ehrlich, McNatt, Gobelman & Cobb, Jacksonville, Fred W. Baggett, Tallahassee, for appellees.
LARRY G. SMITH, Judge.
This case deals with the sufficiency of pleadings filed in litigation arising from a contractual dispute. Health Application Systems, Inc. (HAS) appeals an order of the trial court dismissing, with prejudice, its counterclaim against appellee, State of Florida, Department of Health and Rehabilitative Services (HRS), and the third party complaint of HAS against appellee, Hartford Life and Accident Insurance Company. The litigation was initiated by HRS, which sued Paid Prescriptions, Inc. (PAID), and HAS, claiming breach of contract and conversion of funds by PAID and HAS under PAID's agreement with HRS for the furnishing of certain administrative services relating to the Florida Medicaid Drug Program. The issues on appeal are (1) whether HAS's counterclaim against HRS stated a cause of action based upon an alleged assignment by PAID, to HAS, of certain funds payable under the contract between PAID and HRS; and (2) whether HAS's third-party complaint states a cause of action against Hartford, in behalf of HAS as a third-party beneficiary of a reinsurance agreement between Hartford and PAID which protected PAID from losses under its contract with HRS. The third-party complaint also sought recovery against Hartford based upon theories of indemnification, contribution, or subrogation. We agree *296 with the trial judge's ruling that neither the counterclaim nor the third-party complaint state a cause of action, and we affirm the orders of dismissal.
An explanation of the status of the parties and the manner in which the dispute arose will be helpful in understanding the issues. The State of Florida participates in the Medicaid program under Title XIX of the Social Security Act, 42 U.S.C.A. § 1396, et seq. (1974). The State's program provides pharmaceutical drug benefits to low income individuals. HRS, which is in charge of the program for the State, entered into a contract in 1974 with PAID to administer the program, keep records, and pay the pharmacists providing drugs to Medicaid recipients. PAID was compensated by HRS by fixed rate "premiums" based upon the number of eligible recipients receiving drugs. PAID protected itself against the possibility of loss under the 1974 contract by a "stop-loss" or reinsurance agreement with Hartford. The reinsurance agreement expired on June 30, 1976, the date on which the 1974 contract terminated. Although PAID and HRS entered into a second contract commencing July 1, 1976, no reinsurance agreement was entered into with Hartford for coverage of this second contract.
PAID's contractual arrangement with HAS was as follows: PAID subcontracted with HAS for HAS to perform certain duties under the 1974 and 1976 contracts, consisting of the administrative, managerial, and record keeping functions, including preparation of checks and making payments using PAID's funds. For the services performed, HAS was to receive 9 1/2% of all contract premiums received by PAID from HRS.
The suit filed by HRS against PAID and HAS claims damages relating to the 1976 contract. HRS's claim is that PAID and HAS breached the 1976 contract and converted funds paid by HRS under the 1976 contract by paying claims owed by PAID under the 1974 contract. HRS claims injury because the contract required PAID to maintain a reserve account for deposit of premiums paid by HRS, from which HRS was to receive the interest earned and 75% of the balance remaining at the expiration of the contract. HRS alleged that as a result of the improper payment of funds by PAID (through HAS), HRS sustained claimed damages in excess of three million dollars. After filing of the complaint, HRS and PAID settled all claims against each other, and PAID was dismissed from the law suit.
Turning first to the issues relating to dismissal of HAS's counterclaim against HRS, we note initially that the counterclaim, although in two counts, essentially is based upon HAS's allegation that it has a cause of action directly against HRS by virtue of an assignment by PAID to HAS of 9 1/2% of the premiums payable by HRS to PAID under the 1974 contract. We conclude, after examination of the pleadings, and the contracts attached as exhibits, that there was no assignment, and that consequently, dismissal of the counterclaim was proper.
The pertinent language of HAS's contract with PAID, relied upon by it as an assignment, is as follows:
"WHEREAS, PAID desires to subcontract certain of its obligations and to assign certain of its rights under the Third Party Contract to HAS; and
"WHEREAS, HAS is willing to assume the obligations hereinafter referred to in consideration of the assignment of that portion of HAS' rights under the contract hereinafter described;
"1. PAID does hereby subcontract to HAS and HAS does hereby assume and agree to perform all of the obligations imposed upon PAID pursuant to the following provisions of the Third Party Contract . ..
* * * * * *
"3. PAID agrees to remit to HAS, or authorizes HAS to retain, as the case may be, nine and one-half (9 1/2%) of the gross monthly premiums received by PAID, as the case may be, pursuant to the Third Party Contract ..." [Emphasis supplied]
*297 We parenthetically observe that under the Florida Rules of Civil Procedure, and case law interpreting the rule, exhibits attached to a pleading become a part for all purposes; and if an attached document negates the pleader's cause of action or defense, the plain language of the document will control and may be the basis for a motion to dismiss. Rule 1.130(b), Florida Rules of Civil Procedure; Padgett v. First Federal S & L Ass'n, 378 So.2d 58 (Fla. 1st DCA 1979). See also Trawick, Florida Practice and Procedure, § 6-15 at 75 (1978).
We think it is clear, as argued by HRS, that the contractual provision whereby HAS was to receive 9 1/2% of the gross monthly premiums "received by PAID", does not constitute an assignment. A mere agreement to pay a debt out of a designated fund does not operate as a legal or equitable assignment, since the assignor retains control over the subject matter. Miller v. Wells Fargo, 540 F.2d 548, 558 (2nd Cir.1976). Such an agreement amounts only to a mere promise to pay, and does not meet the test of an intention on the part of the assignor to give, and of the assignee to receive, present ownership of the fund, Lone Star Cement Corp. v. Swartwout, 93 F.2d 767, 770 (4th Cir.1938).
A subcontractor does not, merely by virtue of the relationship with the principal contractor, become an assignee of funds due under the prime contract. Nickel v. Pollia, 179 F.2d 160 (10th Cir.1950). The rule with respect to subagents is stated in the Restatement of Agency 2d, § 458a as follows:
"If an agent employs a subagent, the agent is the employing person, and the principal is not a party to the contract, except where, by express agreement or otherwise, he becomes a surety. He is not, therefore, subject to pay the agreed compensation, nor is he subject to contractual liability to indemnify the subagent ...".
The contract between HRS and PAID contained the following prohibition against assignment without written consent:
"The contractor shall not sell, transfer, assign or otherwise dispose of this contract or any portion thereof, or of right, title or interest therein, without written consent of the State agency ...". (Article VIII, J)
HAS's counterclaim against HRS, alleging that PAID "assigned to HAS" its right to receive 9 1/2% of all gross monthly premiums, must yield to the specific language of the contract itself, which provides that "PAID agrees to remit to HAS, or authorizes HAS to retain, ... nine and one-half (9 1/2%) of the gross monthly premiums received by PAID, ... pursuant to the third-party contract". Under the authorities cited, we hold that this does not constitute an assignment. However, even if it be construed as an assignment, according to the interpretation placed upon the contract by HAS, it would not be enforceable against HRS because of the specific contractual provision between HRS and PAID prohibiting assignment without written consent of HRS. We find nothing in the counterclaim, nor in the attachments thereto, stating that HRS agreed to the assignment. Although HRS consented to the assumption of certain of PAID's obligations by HAS, as permitted by Article VIII D of the contract, this did not operate as a consent to an assignment under Article VIII J (quoted above), of any portion of the funds accruing to PAID from HRS. Under the circumstances, we must agree with the trial court's determination that the counterclaim fails to disclose the existence of a duty on the part of HRS to pay to HAS the amounts HRS might have been obligated to pay under its contract with PAID.
We next consider the dismissal of HAS's third-party complaint against Hartford. We agree at the outset with Hartford's contention that HAS is not a third-party beneficiary under Hartford's 1974 stop-loss agreement with PAID. The agreement itself states that it is solely between PAID and HARTFORD. We can find no intent to benefit HAS or any other party except PAID, and the agreement is not ambiguous. The general rule applicable to reinsurance agreements is that, in the *298 absence of provisions to the contrary, a reinsurance agreement operates solely as between the reinsurer and the reinsured. McDonough Const. Co. v. Pan American Surety Co., 190 So.2d 617 (Fla. 1st DCA 1966). HAS is bound by the provisions of its contract with PAID. HAS had duties relating only to management of the program, and its operations were in no way insured or protected by the reinsurance agreement. HAS is bound by the rule (correctly stated in its brief) that in order to establish a claim based upon the stop-loss agreement, HAS must be shown to be a direct and intended beneficiary of the agreement, not merely an incidental beneficiary. American Surety Co. of New York v. Smith, 100 Fla. 1012, 130 So. 440 (1930); Marianna Lime Products Co. v. McKay, 109 Fla. 275, 147 So. 264 (1933). It is further not disputed by HAS, that in order for this court to find the requisite intent to entitle HAS to sue as a third-party beneficiary, it must be shown that both PAID and Hartford intended to benefit HAS. On this point, HAS is bound by the plain and unambiguous language of the agreements themselves, and its own pleadings, which foreclose a finding of such intent.
We think there is some confusion in HAS's argument concerning the scope of the Hartford reinsurance agreement. HAS's brief (page 2) states that if premiums received from HRS exceeded total pharmacy claims paid, PAID made a profit; but if claims exceeded premiums, PAID would suffer a loss. The brief further states:
"To insure its risk of loss under the contract, ... PAID entered into a reinsurance agreement by which Hartford agreed to reimburse PAID in the event contract claims exceeded premiums." (HAS brief, page 2)
However, HAS's brief (page 12) also contains an entirely different statement of this coverage:
"The agreement provides for Hartford to reimburse PAID should it incur a loss in performing the 1974 contract. Such reimbursement would cover the losses of PAID, including the fees required to be paid to HAS and any other losses suffered by HAS as a result of its subcontract."
We have examined the pleadings and documents, but we can find no support for the contention that the reinsurance agreement provided coverage for sums owed by PAID to HAS, nor does it provide coverage for "any other losses suffered by HAS as a result of the subcontract" as argued by HAS. The reinsurance agreement defines "Covered Services" as services "for which a prescription is filled by a pharmacy" during the period covered by the reinsurance agreement. Reimbursement, under the agreement, was at the rate of ninety (90) per cent for covered services arranged, provided, reimbursed or paid for by PAID to the extent that the sum of the cost of such services, plus a claims administration expense allowance equal to 5% of such cost, exceeds 95% of the income received by PAID from HRS. We can conceive of no circumstances under which any payment made by Hartford to PAID would exceed the amount of drug claims actually incurred by PAID. It is therefore difficult to understand the basis for HAS's argument that the agreement provided coverage for losses sustained by HAS.
HAS has also attempted to allege a cause of action against Hartford based upon indemnity, on the theory that Hartford, not HAS, was responsible for any injury to HRS. HAS argues in this connection that but for Hartford's wrongful refusal to pay PAID for its alleged loss covered by the stop-loss agreement, PAID would not have been compelled to use 1976 funds to pay 1974 contract claims  thus, HRS would have suffered no loss. We are unable to accept HAS's allegation that Hartford's failure to fulfill its obligations to PAID under the stop-loss agreement "caused" PAID to utilize 1976 contract premiums to satisfy its obligations under the 1974 contract. The allegation as to causation is a conclusion which does not follow from the facts alleged. That PAID did (through HAS) wrongfully pay out the 1976 funds is *299 a fact; but Hartford's failure to pay to PAID funds due under a separate and distinct contract (the 1974 contract) cannot logically be the "cause" of the wrongful payment.
This claim of "implied contract of indemnity" rests also upon HAS's claim of status as a third-party beneficiary of the stop-loss agreement, a contention we have already rejected. The claim of a right to indemnity must therefore also fall.
We find no basis for the contention that Hartford is guilty of tortious conduct. We fail to find within the allegations of the counterclaim any allegation of breach of duty by Hartford other than that arising under the reinsurance contract, as to which HAS was neither a party nor a third-party beneficiary. Nor is there any allegation of common liability, which would be necessary to support a claim of contribution. Similarly, we can find no basis upon which HAS may recover by way of subrogation against Hartford. The claims of HRS against PAID and HAS arise out of the misapplication of funds paid out by HRS under the 1976 contract, as to which Hartford has no liability.
For the foregoing reasons, the orders of dismissal, with prejudice, are affirmed.
McCORD and SHIVERS, JJ., concur.