DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**PHYSICIANS CARE CENTERS OF FLORIDA, LLC,**
Appellant,

v.

**PNC BANK, NATIONAL ASSOCIATION,** et al.,
Appellees.

No. 4D21-3228

[August 17, 2022]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; James Nutt, Judge; L.T. Case No. 502018CA009813.

Eric N. Assouline and Greg M. Popowitz of Assouline & Berlowe, P.A., Dania Beach, for appellant.

Stephen J. Simmons and Seth A. Kupilik of Mombach, Boyle, Hardin & Simmons, P.A., Ft. Lauderdale, for appellee PNC Bank, National Association.

GROSS, J.

Physicians Care Centers of Florida, LLC, appeals a final judgment in garnishment entered in favor of PNC Bank, N.A. Physicians Care contends that its interest in the garnished funds nullified the effect of the garnishment writ. We reject that claim because the failure of Physicians Care to obtain the required license precluded it from being the payee of the garnished funds. At the time the garnishment writs were served, the funds were subject to garnishment as a "debt due" to a judgment debtor within the meaning of Chapter 77, Florida Statutes (2021). We therefore affirm.

### *The Asset Purchase Agreement and the Assumption Agreement*

After engaging in extensive negotiations and conducting UCC searches as part of its due diligence, Physicians Care entered into an Asset Purchase Agreement with William D. DeMarchi, M.D., P.A. (the "Seller"), wherein Physicians Care agreed to acquire substantially all the assets and certain liabilities of the Seller's medical practice.

The Asset Purchase Agreement included specific provisions for Purchased Assets (Section 2.01), Excluded Assets (Section 2.02), Assumed Liabilities (Section 2.03), and Excluded Liabilities (Section 2.04).

Under Section 2.01(c) of the Asset Purchase Agreement, Physicians Care purchased "all of Seller's right, title and interest" in "all Contracts described in Schedule 2.01(c)." Schedule 2.01(c), in turn, listed: "**Contracts**: Including but not limited to all contracts and related revenues from such contracts (i.e., Humana, BCBS, Aetna, Cigna, etc.)."

Under Section 2.03(f) of the Asset Purchase Agreement, Physicians Care assumed a portion of the Seller's liability associated with a secured loan by City National Bank.

On the same day the contracting parties executed the Asset Purchase Agreement, they also executed an Assignment and Assumption Agreement (the "Assumption Agreement"). The Assumption Agreement stated that Physicians Care "hereby assumes and agrees to pay and perform the Seller Liabilities." The Assumption Agreement was attached as an exhibit to the Asset Purchase Agreement.

### The Closing

Physicians Care paid a portion of the purchase price at closing, with the remainder paid over the ensuing twelve months. Physicians Care also made payments to City National Bank on the secured debt.

### After the Closing, PNC Obtains Judgments Against the Seller

Back in 2008, the Seller entered into an unsecured Small Business Premium Credit Line Agreement with PNC's predecessor-in-interest.

In June 2018, about six months after the effective date of the Asset Purchase Agreement, PNC sent a demand letter to the Seller alleging a default on the credit agreement.

In April 2019, PNC obtained a Default Final Judgment against the Seller and Dr. DeMarchi in the amount of $111,546.21. The trial court later entered a Supplemental Final Judgment Awarding Attorney's Fees for $18,014.

### PNC Begins Garnishment Proceedings

Following the entry of the Default Final Judgment, PNC served writs of garnishment upon medical insurance companies that it believed to be indebted to the Seller.

Both Humana and Blue Cross Blue Shield ("BCBS") answered multiple writs of garnishment, each time stating that they were indebted to the Seller.

Physicians Care filed an affidavit under section 77.16, Florida Statutes, claiming ownership of the funds subject to the writs of garnishment. Shortly thereafter, Physicians Care moved to dissolve the writs of garnishment, alleging that the insurance remittances were its property, as assignee of the Seller under the Asset Purchase Agreement.

### *Evidence Elicited During Discovery*

In a deposition, the manager of Physicians Care testified that the debt owed to City National Bank delayed the business's filing for a license with the Agency for Health Care Administration ("AHCA"). The manager explained: "I'm not a physician, so in order for me to take ownership of a medical practice . . . I have to get an AHCA license." The manager admitted that Physicians Care did not have a license for the Seller's practice, explaining: "It has been applied for. I have not received it yet. It takes months."

When medical practice assets are transferred, the manager noted, "[u]sually it takes three to six months to do the insurance companies and it takes up to a year to do Medicare. That's standard in our industry." The manager explained: "Typically, once the ACHA is filed and approved and the insurance companies are able to be notified, we roll the assets from the former entity to the new entity. That has not taken place yet, because of the City National delay, which also delayed the . . . [AHCA] filing." The manager testified that Physicians Care could not start the licensing process with the AHCA "until City National allowed me to move the assets." The only assets that could be moved initially were "ones that were not directly maintained by the practice."

The manager confirmed that the Seller was "still in existence." The manager said that he was currently listed as the Seller's president and registered agent, but he denied having an active role with the Seller.

Following the execution of the Asset Purchase Agreement, the Seller continued to bill the medical insurance companies just as it had done prior to the purchase agreement. Physicians Care never submitted bills to the

3

insurance companies and it did not have any written agreements with either Humana or BCBS. After the sale closed, insurance proceeds were "still going into" the Seller's account. Physicians Care swept this money from the Seller's account into accounts it controlled.

Neither BCBS nor Humana had possession of any executed "Consent to Assign" document completed in connection with the transaction here at issue.

### *The Cross Motions for Summary Judgment and Final Judgment*

Physicians Care moved for summary judgment, arguing in part that PNC was not entitled to garnish the funds held by the insurance companies because the Seller had assigned the insurance proceeds to Physicians Care in the underlying Agreements.

PNC moved for summary judgment arguing, among other things, that there was "no genuine issue of fact as to who owns the funds garnished," as the "roll" of assets from the Seller to Physicians Care had not yet taken place. PNC argued that, without a license, Physicians Care was not legally capable of operating a medical provider.

After some litigation twists and turns, the trial court granted final summary judgment in favor of PNC and denied the opposing motion of Physicians Care. This appeal ensued.

### *Florida's New Summary Judgment Rule*

Florida's new summary judgment rule governs the adjudication of any summary judgment motion decided on or after May 1, 2021, including in pending cases. *In re Amends. to Fla. R. Civ. P. 1.510*, 317 So. 3d 72, 77 (Fla. 2021).

The amended rule states that summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fla. R. Civ. P. 1.510(a) (2021). "[T]he correct test for the existence of a genuine factual dispute is whether 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *In re Amends. to Fla. R. Civ. P. 1.510*, 317 So. 3d at 75 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Under our new rule, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for

4

purposes of ruling on a motion for summary judgment.'" *Id.* at 75–76 (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).

### *The Framework of Garnishment Law*

A judgment creditor has the right to a writ of garnishment

> to subject **any debt due to defendant** by a third person or any debt not evidenced by a negotiable instrument **that will become due absolutely through the passage of time only** to the defendant by a third person, and any tangible or intangible personal property of defendant in the possession or control of a third person.

§ 77.01, Fla. Stat. (2021) (emphasis added).

"Under this statute, a debt, to be subject to garnishment, must be due absolute and without contingency." *Tomlin v. Anderson,* 413 So. 2d 79, 82 (Fla. 5th DCA 1982). "Even indebtedness that may become due by the lapse of time is garnishable, as long as it is due absolutely." *Cap. Factors, Inc. v. Alba Rent-A-Car, Inc.,* 965 So. 2d 1178, 1182 (Fla. 4th DCA 2007). By contrast, "[i]f there is anything contingent or to be done by a person before the liability of another becomes fixed, there is not such an 'indebtedness due' as contemplated by the statute to which a writ of garnishment can apply." *W. Fla. Grocery Co. v. Teutonia Fire Ins. Co.,* 77 So. 209, 211 (Fla. 1917).

The effect of service of a writ of garnishment on a garnishee is to "make garnishee liable for all debts due by [garnishee] to defendant . . . at the time of the service of the writ or at any time between the service and the time of the garnishee's answer." § 77.06, Fla. Stat. (2021).

"The function of garnishment proceedings is to permit a creditor to subject to the payment of his claim property of his debtor in the hands of a third person." *Mercantile Ins. Co. of Am. v. Jackson,* 242 P.2d 503, 504 (Wash. 1952). "A creditor can obtain no better right against a third party, garnishee defendant, than the principal debtor had as of the date of the garnishment." *Id.*

A valid assignment accomplished before the service of a garnishment writ prevails over the later garnishment. For example, in a case involving an assignment for the benefit of creditors, the Florida Supreme Court declared that "if the assignment be valid, and the assignee's title undisputed, he holds by title paramount to that of the assignor, and the

5

purpose [o]f[] the assignment cannot be defeated by garnishment proceedings instituted by a creditor of the assignor." *Dorr v. Schmidt*, 21 So. 279, 281 (Fla. 1896).

Similarly, in *In re Armando Gerstel, Inc.*, 65 B.R. 602, 606 (S.D. Fla. 1986), the court held that, as to certain assignees, a judgment creditor's garnishment claim against an insurance company "must be dismissed because, at the time of service of the garnishment writ, [the debtor] had already transferred all his interest in the insurance claim to these [assignees]" and thus the insurance company "did not possess any property of [the debtor] that could be garnished."

Likewise, in *Jackson*, the court held that "an effective equitable assignment of the insurance proceeds was consummated prior to the attempted garnishment," and thus the assignee was entitled to the insurance proceeds, where the debtor endorsed the insurance check, designated the assignee as a payee on the check, and delivered the check to the bank for transmission to the assignee. 242 P.2d at 504–05.

### At the Time the Garnishment Writs Were Served, the Insurance Proceeds Were a "Debt Due" to the Seller, so Those Funds Were Subject to Garnishment

Physicians Care was not properly licensed at the time the garnishment writs were served, so the Seller's assignment of its right to receive the insurance payments was not complete. When the writs were served, BCBS and Humana were obligated to remit payment only to the Seller; that obligation was a "debt due" within the meaning of section 77.01, subject to garnishment. This legal status is reflected by the conduct of the parties—the insurers made payments to the Seller's bank account and such payments were later transferred by Physicians Care to its own account.

A court will find an assignment "when there is an intent to assign a present right in the subject matter of the assignment, divesting the assignor of all control over that which is assigned." *Armando Gerstel*, 65 B.R. at 605. "A mere agreement to pay a debt out of a designated fund does not operate as a legal or equitable assignment, since the assignor retains control over the subject matter." *Health Application Sys., Inc. v. Hartford Life & Acc. Ins. Co.*, 381 So. 2d 294, 297 (Fla. 1st DCA 1980). "Such an agreement amounts only to a mere promise to pay, and does not meet the test of an intention on the part of the assignor to give, and of the assignee to receive, present ownership of the fund." *Id.* Thus, in *Health Application Systems*, the court held that a contractual provision whereby

6

a subcontractor was to receive 9 1/2% of the gross monthly premiums received by a Medicaid program administrator did not constitute an assignment. *Id.*

In *Giles v. Sun Bank, N.A.,* 450 So. 2d 258, 260 (Fla. 5th DCA 1984), the Fifth District discussed the requirements of a valid equitable assignment:

> [C]ourts of equity can recognize certain kinds of instruments as valid equitable assignments, where it is necessary to effectuate the plain intent of the parties or where to hold otherwise would be unjust. No particular words or form of instrument is necessary to effect an equitable assignment and any language, however informal, which shows an intention on one side to assign a right or chose in action and an intention on the other to receive, if there is a valuable consideration, will operate as an effective equitable assignment. . . . ***[T]he true test of an equitable assignment is whether the debtor would be justified in paying the debt to the person claiming as assignee***.

(citations omitted; emphasis added). For purposes of applying the *Giles* test here, the "debtor" refers to the obligor/garnishee—not the judgment debtor. *See id.* at 260–61.

Physicians Care relies upon *Howard v. Metcalf*, 487 So. 2d 43 (Fla. 2d DCA 1986), to support the argument that "[a] buyer does not lose its priority to the accounts receivable over a subsequent creditor merely because there are delays in complying with regulatory hurdles to formally change account names related to the asset transfers." But *Howard* does not stand for this proposition, nor is it applicable to this case.

The central issue in *Howard* had nothing to do with the assignment of a chose in action. Instead, the issue was whether the third-party purchasers of a liquor license—who entered into the contract without knowledge of an earlier buyer but who learned of that buyer before the license was transferred by the agency—would be required to transfer the license to the earlier buyer. *Id.* at 45. The court rejected the earlier buyer's argument that the third-party purchasers' contract for the sale of the license "was not consummated until the Division transferred the license," explaining:

> The Division's transfer of a liquor license, a function it is obligated to fulfill under section 561.32, Florida Statutes

(1985), neither transfers property rights nor vests title in the purchaser of the license. Such transfer serves only to maintain record continuity in the ownership and management of a liquor business in order that it may be regulated pursuant to Chapter 561.

*Id.* (citation omitted).

*Howard* was a case where the agency was "obligated" to transfer the liquor license as a ministerial duty that served "only to maintain record continuity." *Id.* Unlike the sale of a liquor license in *Howard*, this case involves the sale of the assets of a physician's medical practice, so a different regulatory scheme is implicated.

The Health Care Licensing Procedures Act, codified at sections 408.801–408.832, Florida Statutes (2021), applies to licensing of health care providers. Section 408.804(1) states:

> It is unlawful to provide services that require licensure, ***or operate or maintain a provider that offers or provides services that require licensure, without first obtaining from the agency a license*** authorizing the provision of such services or the operation or maintenance of such provider.

§ 408.804(1), Fla. Stat. (2021) (emphasis added).

Section 408.807 is entitled "Change of ownership" and provides that "[w]henever a change of ownership occurs":

> (1) The transferor shall notify the agency in writing at least 60 days before the anticipated date of the change of ownership.
>
> (2) The transferee shall make application to the agency for a license within the timeframes required in s. 408.806.
>
> (3) The transferor shall be responsible and liable for:
>
> (a) The lawful operation of the provider and the welfare of the clients served ***until the date the transferee is licensed by the agency***.

§ 408.807(1)-(3)(a), Fla. Stat. (2021) (emphasis added).

8

Section 408.806, in turn, governs the "License application process" and provides in relevant part:

> (2)(b) The applicant for initial licensure due to a change of ownership must submit an application that must be received by the agency at least 60 days prior to the date of change of ownership.
>
> * * *
>
> (3)(c) Within 60 days after the receipt of a complete application, the agency **shall approve or deny the application**.

§ 408.806(2)(b) & (3)(c), Fla. Stat. (2021) (emphasis added).

Finally, section 400.9935(3), which is part of the Health Care Clinic Act, states:

> A charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part, regardless of whether a service is rendered or whether the charge or reimbursement claim is paid, is an unlawful charge and is noncompensable and unenforceable.

§ 400.9935(3), Fla. Stat. (2021).

Although the definition of "clinic" has many statutory exceptions, a clinic license is generally required for a non-physician owner of a physician practice that tenders charges for reimbursement for health care services. *See* Ch. 400, Part X, Fla. Stat. (2021).

Because Physicians Care had not obtained a license to operate a medical practice, the assignment of the Seller's contract rights with the health insurance providers was not completed for the purpose of the garnishment statute. At the time the writs were served, the "debt due" from the insurers was to the Seller, not to Physicians Care. Here, the test of a completed equitable assignment was whether the insurers would have been justified in paying the debt (i.e., the insurance proceeds) directly to Physicians Care. The test was not satisfied because the insurers' legal obligation to make payment was to the Seller, not to Physicians Care.

This view is supported by the record, which reflects that no consents to assignment were completed for the BCBS and Humana contracts to effectuate a change in the payee of the insurance proceeds. Treating the garnished funds as owned by Physicians Care would subvert the Health Care Licensing Procedures Act by allowing an unlicensed entity to assume the role of a medical provider.

Another factor supporting the finding of an incomplete assignment is that the Seller did not relinquish all control over the insurance proceeds. Those monies were initially received by the Seller before they were transferred to Physicians Care. That Physicians Care controlled the Seller's bank accounts is of no import, as the Seller's identity as a separate legal entity must be honored. The Seller was still in existence and continued to operate the medical practice. The Seller's pattern of transferring the insurance proceeds from its account to that of Physicians Care is akin to an agreement to pay a debt out of designated fund, not an assignment of the right to receive those funds directly from the insurance companies.

Physicians Care cites two cases for the proposition that "there is an entire industry of medical service provider receivables financing, where account receivables derived from medical services are assigned to third parties." However, the assignments in those cases were assignments for the purpose of collections or security/financing. Neither case involved an assignment of a medical practice's assets to a company specifically formed to acquire and operate the practice. *See In re EZ Pay Servs., Inc.,* 389 B.R. 751, 756–58 (Bankr. M.D. Fla. 2007) (holding that bankruptcy trustee had a substantial likelihood of success on the merits of the claim that medical provider's contract with a collector was an assignment of the enrolled patient accounts and thus the accounts were property of the collector's bankruptcy estate); *Cozzetto v. Banyan Fin., LLC,* 234 So. 3d 803, 804 (Fla. 4th DCA 2018) (holding that substitute service on the defendant was insufficient, but noting that the dispute arose from the defendant medical provider's agreement to repay financing companies using its account receivables collected over time, which the financing companies assigned to the plaintiff). As PNC argues, the Asset Purchase Agreement was an attempt to assign the Seller's contract rights, not just the accounts receivable.

### *Conclusion*

For these reasons, we affirm the Final Judgment in Garnishment. Because the issue discussed in this opinion is dispositive, we do not address the other arguments raised in the briefs.

*Affirmed.*

CIKLIN and KUNTZ, JJ., concur.

\*         \*         \*

***Not final until disposition of timely filed motion for rehearing.***